UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-CV-11459-RGS

HARRY BYRNE

v.

UNITED STATES OF AMERICA

<u>MEMORANDUM AND ORDER ON
PETITIONER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE</u>

November 18, 2008

STEARNS, D.J.

Harry Byrne, a *pro se* litigant, brought this petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Byrne argues that he is entitled to relief on grounds of ineffective assistance of counsel and judicial and prosecutorial misconduct.[1] For the reasons stated, the petition will be <u>DENIED</u>.

## BACKGROUND

On September 4, 2003, a jury convicted Byrne, a former Boston police sergeant, of one count of deprivation of civil rights in violation of 18 U.S.C. § 242, and four counts of witness tampering in violation of 18 U.S.C. § 1512(b)(3). Byrne's convictions stemmed from a September 9, 2001 assault on Gareth Trombly, an arrestee, in the guard room of

---

[1] Byrne argues that if no single ground is a sufficient basis for overturning his conviction, the grounds asserted are cumulatively sufficient to establish constitutional error warranting relief.

the District 14 station in Allston-Brighton, and Byrne's subsequent efforts to persuade fellow officers to lie to government investigators about the incident.[2]

On December 3, 2003, the court sentenced Byrne to a prison term of seventy (70) months. He timely appealed. The First Circuit affirmed Byrne's convictions, but vacated the sentence and remanded the case for resentencing in light of the Supreme Court's intervening decision in United States v. Booker, 543 U.S. 220 (2005). See United States v. Byrne, 435 F.3d 16, 28 (1st Cir. 2006). On remand, the court reduced Byrne's sentence to a term of sixty (60) months.[3]

On August 8, 2007, Byrne filed this petition. The United States filed a response on January 18, 2008. The court granted Byrne three extensions of time in which to file a reply to the government's brief. No reply was filed. On October 10, 2008, the court indicated that it would dismiss the petition for want of prosecution if Byrne did not respond within twenty-one days. Byrne filed the reply on October 14, 2008.

## DISCUSSION

Section 2255 provides post-conviction relief where a petitioner's sentence "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). "The catch-

---

[2]Trombly, a Harvard College student, was arrested for being drunk in public, providing alcohol to minors, resisting arrest, and spitting on a police officer (Byrne). The incident arose as Trombly and other students were leaving a private party at a Boston College student residence at which alcohol had been freely consumed.

[3]Both sentences included a post-custodial two-year term of supervised release.

all fourth category includes only assignments of error that reveal 'fundamental defect[s]' which, if uncorrected, will 'result[] in a complete miscarriage of justice,' or irregularities that are 'inconsistent with the rudimentary demands of fair procedure.'" Id., quoting Hill v. United States, 368 U.S. 424, 428 (1962). See also Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003). A cognizable section 2255 claim that is neither constitutional nor jurisdictional in nature must be based on exceptional and compelling circumstances. David, 134 F.3d at 474. A petitioner bears the burden of demonstrating an entitlement to relief. Mack v. United States, 635 F.2d 20, 26-27 (1st Cir. 1980).

    1. Ineffective Assistance of Counsel

Byrne argues that his trial counsel, Frank Libby, failed to put the government's case to any meaningful adversarial test. He asserts that Libby was ineffective: (1) in failing to call critical witnesses; (2) in failing to offer evidence that would have "mitigat[ed]" and "deflected" the seriousness of the witness tampering allegations; (3) in laboring under a conflict of interest; (4) in failing to impeach police officer witnesses with their "perjurious" grand jury testimony; and (5) in failing to present evidence of Trombly's purported predisposition to "egg shell" injuries.[4]

The Sixth Amendment provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." To satisfy the Sixth Amendment, counsel must be effective. See Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on his ineffective assistance claim, Byrne is required to satisfy two tests by a preponderance of the evidence.

---

    [4]Trombly suffered a severe jaw fracture during the assault.

> First, [he] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, [he] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. In most cases, a court will first examine the prejudice prong of the test. Gonzalez-Soberal v. United States, 244 F.3d 273, 277-278 (1st Cir. 2001). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.[5]

To establish the prejudice necessary to satisfy Strickland, a "defendant must show that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007), citing Wiggins v. Smith, 539 U.S. 510, 537 (2003). "A reasonable probability is one sufficient to undermine confidence in the outcome." Dugas v. Coplan, 506 F.3d 1, 9 (1st Cir. 2007) (citations omitted). While a defendant need not prove that counsel's errors more likely than not affected the verdict, it is "not enough to show that the errors had

---

[5]To satisfy the first prong of the Strickland test, a petitioner must prove that counsel's performance was "so inferior as to be objectively unreasonable." United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993). "In making this determination, 'judicial scrutiny of counsel's performance must be highly deferential.'" Bucuvalas v. United States, 98 F.3d 652, 658 (1st Cir. 1996), quoting Strickland, 466 U.S. at 689. As the Supreme Court has emphasized, the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

'some conceivable effect on the outcome.'" Gonzalez-Soberal, 244 F.3d at 278, quoting Strickland, 466 U.S. at 693.[6]

    A.  Failure to Call Witnesses

Byrne claims that Libby failed to call several witnesses who would have contradicted testimony offered at trial. Byrne cites the interviews conducted by an investigator hired by Andrew Good, Trombly's attorney, with five women who witnessed Trombly's arrest. The women stated that they saw Byrne exit his patrol car before Trombly was taken into custody. Byrne contrasts these statements with trial testimony suggesting that he had remained in his cruiser until after the arrest, testimony that he contends undermined his claim that Trombly had provoked the confrontation by spitting at him.[7] What Byrne omits is that Trombly, Thomas Davis (a friend of Trombly's who was also arrested), and Kristen Scheier, a student onlooker, all testified that Byrne was out of the cruiser when Trombly was arrested. Officers Kevin Peckham and Gregory Lynch also testified that Byrne was standing outside his cruiser when he ordered them to arrest Trombly.[8]

---

[6] Because, as will become apparent, Byrne can show no prejudice, consistent with Strickland the court will end the discussion with the prejudice prong, save for the observation that the record discloses no instance of materially deficient performance by Libby. He conducted himself with the professionalism that one would expect from an experienced defense counsel and former federal prosecutor.

[7] None of the women recounted seeing Trombly spit at Byrne. Gregory Lynch, the officer who arrested Trombly, testified that Trombly was polite and "just standing there." Jeremiah Harrigan, another of the arresting officers, testified that despite a tirade of profanities directed at him by Byrne, Trombly was not aggressive and consistently addressed Byrne as "Sir."

[8] Byrne personally arrested Davis.

Byrne argues that Libby should have also called two bystanders who told investigators that the only item they saw removed from Trombly's pocket incident to the arrest was a beer can. Byrne claims that this testimony would have contradicted Peckham's and Lynch's testimony that a cell phone had also been taken from Trombly. Byrne argues that the omitted testimony would have supported his version of the assault as a "common sense" defensive reaction to Trombly's pulling an "unidentified black object" (the cell phone) out of his pocket.[9] Byrne omits the fact that Libby closely questioned Lynch and Peckham, as well as Trombly and Scheier, on the subject during cross-examination. He extracted admissions from Trombly, Peckham, and Scheier that in prior statements they had mentioned only the seizure of the beer can. Davis, for his part, testified on direct examination that he had seen the officers seize only the beer can. Further testimony on the subject would have been cumulative. Given the severity of the beating (Byrne conceded that he pinned Trombly against a wall and struck him in the face with the base of his palm), there is no "reasonable probability" that Trombly's possession of a cell phone in the guard room would have influenced the jury's verdict.

Byrne next claims that Libby failed to call Detective Norman Hill of the Boston Police Department's Internal Affairs Division (IAD) as a witness. According to Byrne, Hill would have testified that his IAD investigation exonerated Byrne. Assuming that such was the case and that Hill's opinion as to Byrne's culpability would have been admitted, it would have had little effect, given the rushed and cursory nature of the investigation.

---

[9]Byrne maintains (somewhat implausibly) that Boston police routinely permit arrestees to keep cell phones on their persons until after they are booked.

Superintendent Thomas Dowd, who oversaw the IAD, testified that Hill's investigation was closed on September 24, 2001, only fifteen days after Trombly's arrest.[10]

B. <u>Failure to Introduce Evidence</u>

Byrne argues that Libby failed to marshal evidence to prove that it was impossible for police witnesses to have seen the assault from outside the guard room, or to have overheard the disturbance caused by the scuffle between Byrne and Trombly. Byrne notes that during the deliberations, the jury asked for the height of at least one of the police witnesses. Byrne offers this query as proof of a doubt in the jury's mind as to whether the officers were telling the truth. He additionally argues that had Libby investigated the noise level on the street at night, he would have learned that music from a nearby bar would have drowned out sounds emanating from within the station.[11]

As a preliminary matter, Libby moved unsuccessfully to have the jury take a view of the station house. In denying Libby's motion, the court noted that the photographs and diagrams of the guard room that were to be offered as trial exhibits were a satisfactory substitute for a view. In answer to the jury's query about officer Harrigan's height, the court instructed jurors to rely on their own recollections. Libby thoroughly developed the issue of whether it was possible for the witnesses to see from an outside vantage point into the station. When Harrigan testified that he saw Trombly's upper torso moving backwards,

---

[10]The court did not understand this as a criticism of Hill or the quality of his work, but an acknowledgement of the fact that Boston police stepped back from an official inquiry when the federal investigation began.

[11]It is not altogether clear why Libby, the attorney, would have been expected to investigate something that Byrne, the client, already knew.

7

and Byrne moving in Trombly's direction, Libby used one of the government's own photographs to obtain an admission from Harrigan that he could not recall whether his view through the guard room window had been obstructed by an air-conditioning unit. Moreover, officers Lynch, Harrigan, and Kristine Straub (and Trombly's friend Davis) all testified at trial that they were (or, in the case of Harrigan and Straub, had moved) *inside* the station when Byrne punched Trombly in the face. Byrne's argument regarding the ambient noise around the station likewise has no merit, as Harrigan and Straub both testified that they did not hear anything before they entered the guard room.

Next, Byrne argues that Libby failed to introduce evidence of a purported preexisting medical condition that made Trombly more susceptible to temporomandibular joint disorder, thereby increasing the potential for his jaw to be dislocated by the slightest of impacts.[12] Byrne has failed to point to any medical evidence in the record that indicates that Trombly in fact suffered from such a condition (whatever its legal significance). Moreover, Libby had retained a medical expert, Dr. Meredith August, a maxillofacial surgeon at Massachusetts General Hospital, who testified that Trombly's injuries could have been caused by a relatively minor, but adventitiously placed blow.

C. Conflict of Interest

Byrne finally claims that Libby provided less than zealous representation because of the failure of the Boston Police Superior Officers Federation's (Federation) to pay Libby

---

[12]Byrne argues (somewhat improbably) that Trombly did not suffer any injuries consistent with a severe beating. It will be recalled that Trombly suffered a broken jaw.

8

in a timely fashion.[13]  Byrne argues that letters between Libby and Harold Lichten, the counsel for the Federation, make it clear that Libby was not paid according to the promised schedule.  Byrne alleged that Libby's performance at trial was hindered by his preoccupation with the fee issue.  Byrne claims that as a result Libby "sold [him] out" and "manipulat[ed] the playing field to have a quicker trial."

The constitutional right to counsel carries with it a correlative right to representation free from any conflict of interest. See Cuyler v. Sullivan, 446 U.S. 335, 346 (1980); Strickland, 466 U.S. at 688.  A defendant cannot rely on a presumption of prejudice, but "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 348.  For Sixth Amendment purposes, an "actual" conflict of interest is a conflict that adversely affects counsel's performance, "as opposed to a mere theoretical division of loyalties." Mickens v. Taylor, 535 U.S. 162, 171 (2002). An actual conflict of interest arises when an attorney subordinates his duty to his client to other interests or loyalties and "pulls his punches" as a result. United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st Cir. 1994).  "[I]n order to show an actual conflict of interest, a defendant must show that (1) the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." Id.

The court has reviewed the trial transcripts and its own notes of the trial.  There is no inkling in the record that Libby failed to pursue a plausible alternative defense strategy or tactic, or that he "pulled any punches" in his representation of Byrne, nor is there any

---

[13]The Federation had retained Libby to represent Byrne, a Federation member.

suggestion from Byrne of the different tack he would have had Libby take. Libby's defense of Byrne was zealous. He filed numerous pretrial motions, aggressively cross-examined witnesses (including Byrne's former police colleagues and superiors), and pressed persistent and often persuasive arguments on Byrne's behalf. On appeal, he obtained a remand to this court, and achieved a ten-month reduction of Byrne's sentence.[14] Byrne's dissatisfaction at bottom is not with Libby, but with jurors who rejected his attempts to shift blame to Trombly and to the officers whose testimony he attempted to corrupt.

    2. Judicial Misconduct

Byrne takes issue with a comment regarding the trial schedule that the court made to potential jurors during *voir dire*. The court stated,

> [i]n fact you know [the trial] will stay on schedule because I have pressing obligations, too. I leave for Budapest to do work for the Department of Defense - I'll talk to you about this at the end of the case - on weapons of mass destruction on Friday. So we are going to finish. You can trust that.

---

    [14]Byrne also claims that Libby failed to explain to the jury what actually constitutes witness tampering. (Byrne does not elaborate beyond what was said on the subject to the Court of Appeals). This claim has been previously litigated unsuccessfully before this court and on appeal. Byrne is, absent extraordinary circumstances (such as an intervening change in the law or newly discovered evidence), procedurally barred from relitigating the claim by way of a § 2255 motion. Knight v. United States, 37 F.3d 769, 774 (1st Cir. 1994). The same is true of Byrne's argument that Libby failed to argue that the police witnesses had committed perjury at his trial for fear of government reprisal. Byrne maintains that rank and file officers (especially the younger officers) lived in fear of "crossing swords" with the federal government because of the experience of Kenneth Conley, a Boston police officer who turned from a federal witness into a perjury defendant.

Byrne argues that the court's statement was inflammatory and rushed the jury to an ill-considered and perfunctory verdict.[15] The jury, he argues, was put to a choice between careful deliberations and the court's national security service.[16] This issue could have been raised on direct appeal but was not. It therefore, may not be raised now without a showing of "cause" and "prejudice." Owens v. United States, 483 F.3d 48, 56-57 (1st Cir. 2007). Byrne has failed to demonstrate prejudice. The court made the comment during *voir dire*, before the jury was selected. At no time did the court urge the jury to hurry its deliberations. To the contrary, the court instructed the jurors immediately before they retired that

> [e]ach of you must decide the case for yourself, but should do so only after considering all of the evidence, after listening to the views of your fellow jurors, and after discussing the case fully with the other jurors. . . . [D]o not surrender an honest conviction as to the weight and effect of the evidence simply for the expedience of arriving at a verdict.

3. Prosecutorial Misconduct

Finally, Byrne maintains that he was the victim of town-gown class warfare waged by university elites against blue collar Boston police officers. Byrne claims that he was the "fall guy" for the arrests of privileged college students whose parents resented the damage done to their childrens' careers. In support, Byrne argues that then Boston Police Commissioner Paul Evans belonged to a country club on Cape Cod that employed

---

[15]The court has already denied Byrne's two motions for recusal based on this remark.

[16]This is not borne out by the record. The jury deliberated through the late afternoon of Wednesday, September 3, 2003, without reaching a verdict. It returned to continue its deliberations the following day, September 4, 2003, reaching a verdict late that morning.

Trombly, and that as the result of a social relationship between the Evans and Trombly families, influence was exerted on the Suffolk District Attorney to *nolle prosequi* the state charges against Trombly.[17] Byrne additionally claims that Good (Trombly's attorney) pressured the United States Attorney to induce the Suffolk District Attorney to drop the charges. In pursuit of this claim, Libby sought an evidentiary hearing prior to trial into the District Attorney's reasons for dismissing the charges. The court rejected the request based on the government's representation that no Assistant U.S. Attorney or federal or state investigator had urged the District Attorney to enter a *nolle prosequi*. Byrne has offered no evidence to the contrary.[18]

4. Cumulative Impact

Because Byrne has failed to establish any colorable section 2255 basis for relief, there is no viable claim of cumulative error.

ORDER

For the foregoing reasons, Byrne's motion to vacate his sentence is DENIED. The petition is DISMISSED with prejudice. The Clerk may now close the case.

---

[17] The government moved *in limine* to exclude evidence that Trombly had been employed at the Cape Cod Beach and Tennis Club during three summers in which Commissioner Evans and his family has been members. The court denied the government's motion.

[18] Byrne seeks an evidentiary hearing into the "real facts" that have been concealed from the court. Byrne has no *per se* right to an evidentiary hearing, and no hearing is warranted in this instance. See Dziurgot v. Luther, 897 F.2d 1222, 1225 (1st Cir. 1990). "[A] petition can be dismissed without a hearing if the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or if the allegations cannot be accepted as true because 'they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id., quoting Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989).

SO ORDERED

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE